UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
EARL HARRIS,

                          Plaintiff,

           - against -

CITY OF NEW YORK DEPARTMENT OF
HEALTH AND MENTAL HYGIENE,

                          Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
24-CV-4348 (PKC) (SDE)

PAMELA K. CHEN, United States District Judge:

Plaintiff Earl Harris filed this employment discrimination action against the City of New York Department of Health and Mental Hygiene (the "DOHMH") on June 19, 2024.  (Compl., Dkt. 2.)  He claimed that the DOHMH unlawfully discriminated against him based on his race, disability, and protected activity.  (*Id.* at 1.)  Harris was represented by counsel when he filed the Complaint, but his attorney was terminated after repeatedly failing to comply with Court orders and deadlines.  (Pl.'s Mot. to Substitute Att'y, Dkt. 19; Order Granting Mot. to Substitute Att'y, Dkt. 20; *see also* 10/04/2024, 10/21/2024, 12/03/2024, 12/09/2024, 12/20/2024, 2/14/2025, 2/27/2025, & 2/28/2025 Dkt. Orders.)  Harris, now proceeding *pro se*, filed an Amended Complaint on May 27, 2025.  (Am. Compl., Dkt. 27.)[1]  He reasserts the same allegations of discrimination from his Complaint and additionally alleges that the DOHMH unlawfully

---

[1] Harris filed the Amended Complaint at both Dkt. 25-1 and Dkt. 27.  Throughout this Memorandum and Order, the Court cites to Dkt. 27.

discriminated against him based on his sex, caregiver status and family responsibilities, and age. (*Compare id.* at ECF[2] 1, *with* Compl., Dkt. 2, ¶¶ 10–27.)

On July 28, 2025, the DOHMH filed a motion to dismiss the Amended Complaint in its entirety for failure to state a claim. (Def.'s Mot. to Dismiss, Dkt. 35; Def.'s Mem. Supp. Def.'s Mot. to Dismiss ("Mem."), Dkt. 35-5.) Harris filed an opposition, (Pl.'s Mem. Opp'n Def.'s Mot. to Dismiss ("Opp'n"), Dkt. 34), and the DOHMH filed a reply, (Def.'s Reply Supp. Mot. to Dismiss ("Reply"), Dkt. 36). Harris subsequently filed a motion seeking leave to file a sur-reply, which the Court now grants. (Pl.'s Mot. for Leave to File Sur-Reply, Dkt. 39; Pl.'s Sur-Reply ("Sur-Reply"), Dkt. 40.) For the reasons set forth below, the DOHMH's motion to dismiss is granted in part and denied in part.

## BACKGROUND[3]

Plaintiff Earl Harris is an African American man who has been employed by the DOHMH as a Computer Aide since April 12, 2005. (Am. Compl., Dkt. 27, at ECF 3; Exs. to Am. Compl. ("Exs."), Dkt. 27-1, at ECF 3.)[4] In 2016, Harris took and passed a civil service exam that made him eligible for promotion to "Investigator." (Am. Compl., Dkt. 27, at ECF 7.) Despite applying for the position multiple times between 2019 and 2021, he was not promoted. (*Id.*) He also applied

---

[2] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[3] For purposes of the DOHMH's motion, the Court accepts the non-conclusory factual allegations in the Amended Complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[4] The Court may consider Harris's exhibits because they were attached to and incorporated by reference in the Amended Complaint. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." (first citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); and then citing *Hayden v. County of Nassau,* 180 F.3d 42, 54 (2d Cir. 1999))).

for a promotion to "Clearance Supervisor" in 2021, but was not selected for that position either. (*Id.*)

On January 26, 2022, Harris began working remotely due to the COVID-19 pandemic. (*Id.* at ECF 4.) On April 8, 2022, Harris filed a lawsuit *pro se* in this District, alleging that the DOHMH had unlawfully discriminated against him in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). *Harris v. N.Y.C. Dep't of Health and Mental Hyg[i]ene*, No. 22-CV-1752 (LDH) (LB) (E.D.N.Y. filed Apr. 8, 2022) ("*Harris I*"). He later retained counsel and filed an amended complaint on December 3, 2022. *See* Am. Compl., *Harris I*, Dkt. 38 (attached as an exhibit in this case at Dkt. 35-2). On March 28, 2024, District Judge LaShann DeArcy Hall dismissed *Harris I* in its entirety under Federal Rule of Civil Procedure ("Rule") 12(b)(6) for failure to state a claim on which relief can be granted. *Harris I*, 2024 WL 1332684 (E.D.N.Y. Mar. 28, 2024).

In January 2023, Harris stopped working remotely and returned to in-person work. (Am. Compl., Dkt. 27, at ECF 4.) The next month, on February 10, 2023, he underwent hernia surgery. (*Id.*) The Equal Employment Opportunity Office at his workplace approved telework accommodations for his recovery from that date until March 20, 2023. (*Id.*)

On March 13, 2023, Harris submitted a request to work from home in order to care for his mother, who was "seriously ill." (*Id.* at ECF 5.) His request was denied. (*Id.* at ECF 5–6.) On March 20, 2023, the day Harris's telework accommodations for the hernia surgery ended, he broke his finger and requested a continued telework accommodation. (*Id.* at ECF 5.) That request was also denied. (*Id.* at ECF 5–6.) Harris submitted additional requests related to his broken finger on March 24 and April 7, 2023, which were again denied. (*Id.*) On March 28, 2023, Harris submitted

another request to work from home in order to care for his mother, which was again denied.  (*Id.*)

On April 25, 2023, Harris emailed the DOHMH that his mother had entered home hospice care

and requested to work remotely again.  (*Id.*; *see* Exs., Dkt. 27-1, at ECF 20 (email Harris sent to

DOHMH that day).)  In his email, Harris stated that he "underst[oo]d the [Family and Medical

Leave Act ('FMLA')] is an[] option . . . but this will exhaust my time and cause . . . problems."

(Exs., Dkt. 27-1, at ECF 20.)  Harris followed up with additional documents and requests related

to his mother's condition and/or his own medical issues on May 3, 10, 12, and 13, 2023.  (Am.

Compl., Dkt. 27, at ECF 5.)  All of those requests were denied.  (*Id.* at ECF 5–6.)  In the meantime,

Harris did not return to work.  (*See id.* at ECF 6 (Harris stating that he "returned to work on

September 13, 2023"); *see also* Exs., Dkt. 27-1, at ECF 22 (email from DOHMH representative

stating in August 2023 that Harris had not been at work for "many months").)

In parallel, on March 10, 2023 and June 1, 2023, Harris submitted requests for

accommodations related to his diabetes.  (Am. Compl., Dkt. 27, at ECF 5; Exs., Dkt. 27-1, at

ECF 1.)  Specifically, he requested "flexible scheduling and [t]elework as needed for diabetes

management, including the ability to eat and rest on a predictable schedule and to avoid

hypoglycemic episodes."  (Opp'n, Dkt. 34, at ECF 20.)[5]  On July 28, 2023, the DOHMH denied

Harris's requests related to his diabetes.  (Am. Compl., Dkt. 27, at ECF 5.)  In the decision, the

DOHMH cited its earlier denial of Harris's requests related to his broken finger.  (*Id.*; *see also*

Exs., Dkt. 27-1, at ECF 15 ("The [Reasonable Accommodation ('RA')] Appeals Unit has

determined that the basis of your most recent Reasonable Accommodation request is the same as

the previous request.  A decision was rendered by the RA Appeals Unit on April 21, 2023.").)

---

[5] "On a motion to dismiss, the Court may consider allegations that are contained in a *pro se* plaintiff's opposition papers" in addition to the allegations in the complaint.  *Kauffman v. N.Y. Presbyterian Hosp.*, 762 F. Supp. 3d 309, 314 n.5 (S.D.N.Y. 2025) (citation omitted).

4

Then, on August 3, 2023, Harris's mother's condition "became terminal" and he submitted an "urgent request for leave and tele-work" to remain with his mother during her final days.  (Am. Compl., Dkt. 27, at ECF 6.)  Rather than granting Harris's requests for telework or leave, the DOHMH "cut off Plaintiff's pay, denied [him] retroactive leave, and designated him AWOL." (*Id.* at ECF 14.)

On August 9, 2023, Harris dually filed a charge of discrimination with the New York State Division of Human Rights ("SDHR") and the Equal Employment Opportunity Commission ("EEOC"), in which he alleged that the DOHMH had discriminated against him on the basis of "a qualifying disability."  (Exs., Dkt. 27-1, at ECF 1–2.)  The charge stated that Harris had applied for a reasonable accommodation on June 1, 2023, and that the DOHMH denied his request on July 28, 2023 (presumably in reference to the above-described denial of Harris's requests related to his diabetes).  (*Id.* at ECF 1.)  But, he claimed, the denial "address[ed] a previous accommodation request, separate from [his] June request" and "did not specifically address [his] most recent accommodation request."  (*Id.*)  He further claimed that he "believe[d] [he] was discriminated against by [the DOHMH] when on or around January 2023, [he] was locked out of the office by [DOHMH] security" and "told that [he] can't come into the building until [his] assigned time of 8:30am."  (*Id.* at ECF 2.)  Rather, he was "forced to sit in [his] car for about 15 minutes until [he] was able to enter the building" and was "unable to take [his] medication" because "it was located inside the building."  (*Id.*)

On August 18, 2023, Harris received an email from Renee Noel, DOHMH Assistant Commissioner, that states:

> I'm sorry this is all happening especially with your mom.  Regarding the FMLA, the agency has rules that we have to follow.  You have to submit the forms for FMLA in order for anything else to follow . . . . And you are not eligible for

> telework until you are at work exhibiting the ability to perform your duties. You haven't been at work for many months.

(*Id.* at ECF 22.)

On September 6, 2023, Harris amended his SDHR/EEOC charge to add allegations that the DOHMH had begun to retaliate against him due to his August 2023 charge. (*See id.* at ECF 4.) He stated that, as of August 21, 2023, the DOHMH "ha[d] marked [his] attendance as AWOL . . . even as documentation was submitted informing [the DOHMH of Harris's] need to care for a parent." (*Id.*) He claimed that the DOHMH was "retaliating against [him]" by denying him FMLA leave and "denying [him] any opportunities to partake . . . in the 'volunteer pilot program to work from home.'" (*Id.*)

On September 11, 2023, Harris received an email from Anita Richichi, DOHMH Director of Administration and Strategic Planning. (*Id.* at ECF 23.)[6] Harris alleges that the email states, in substance, that the DOHMH "would not approve Plaintiff's request for retroactive annual leave and would mark him AWOL unless retroactive FMLA forms were submitted." (Am. Compl., Dkt. 27, at ECF 14.)[7] The email also emphasized that "if [Harris] submit[ted] documentation requesting the leave" under the FMLA, rather than as a request for retroactive annual leave, "the medical leave [could] be processe[d]" and the "AWOL [status] removed." (Exs., Dkt. 27-1, at ECF 23.)

---

[6] The right side of the PDF is cut off, so the entire text of the email is not readable. (*See* Exs., Dkt. 27-1, at ECF 23.)

[7] This summary appears accurate based on the portion of the email attachment that is readable, but as noted next above, the email contains a qualifier that is relevant to this matter.

On September 13, 2023, Harris returned to work at the office.  (Am. Compl., Dkt. 27, at ECF 6.)  He became eligible for the agency's work-from-home program on November 1, 2023. (*Id.*)

On March 19, 2024, Harris received a Determination of Charge (or "right-to-sue") letter from the EEOC for his August and September 2023 charges, which gave him 90 days to file a lawsuit on those charges if he so chose.  (*See* Exs., Dkt. 27-1, at ECF 7.)  He initiated this lawsuit through counsel on June 19, 2024,[8] (Compl., Dkt. 2), and filed a *pro se* amended complaint on May 20, 2025, (Am. Compl., Dkt. 27).

The Amended Complaint alleges the following causes of action:

- First Cause of Action: Discrimination based on race, gender, and national origin in violation of Title VII, (*id*. at ECF 8–10);

- Second Cause of Action: Retaliation in violation of Title VII, (*id*. at ECF 11);

- Third Cause of Action: Disability discrimination and failure to accommodate in violation of the Americans with Disabilities Act ("ADA") based on his Type 2 diabetes, hernia, and broken finger, (*id*. at ECF 12);

- Fourth Cause of Action: Disability discrimination and failure to accommodate in violation of the NYCHRL based on his Type 2 diabetes, hernia, and broken finger, (*id*. at ECF 13);

- Fifth Cause of Action: Interference and retaliation in violation of the FMLA based on being his mother's caretaker, (*id*. at ECF 14–15);

- Sixth Cause of Action: Age discrimination in violation of the Age Discrimination in Employment Act ("ADEA") based on being passed over for promotions, (*id*. at ECF 15–16);

---

[8] Although this was 92 days after Harris received his right-to-sue letter from the EEOC, which exceeds the 90-day deadline, the Court previously concluded that the suit was timely filed because: (1) it was unclear when Harris actually received the right-to-sue letter; (2) the 90-day rule is non-jurisdictional and subject to equitable tolling; (3) Harris alleged that his former counsel was responsible for missing the deadline; (4) Harris's then-counsel ultimately abandoned the case entirely; and (5) the delay was only two days.  (5/27/2025 Dkt. Order.)

- Seventh Cause of Action: Violation of the Equal Pay Act ("EPA"), (*id*. at ECF 17–18); and

- Eighth and Ninth Causes of Action: Deprivation of constitutional rights, brought pursuant to 42 U.S.C. § 1983 ("Section 1983"), based on discrimination relating to race, color, gender, age, national origin, disability, and retaliation for exercising his rights under federal law, (*id*. at ECF 18–21).[9]

## DISCUSSION

### I.     Threshold Issues

In its motion, the DOHMH raises three threshold issues that the Court addresses first: (1) whether Harris has exhausted his administrative remedies, as required for some of his claims; (2) whether *Harris I* bars any of Harris's claims based on the doctrine of *res judicata*; and (3) whether Harris's claims are timely under the applicable statutes of limitations.[10] (*See* Mem., Dkt. 35-5, at 4–8.)

### A.     Exhaustion of Administrative Remedies

The DOHMH argues that Harris's Title VII and ADEA claims must be dismissed because Harris failed to exhaust his administrative remedies for those claims. (*Id.* at 6.) The Court agrees.

---

[9] As discussed further below, the Amended Complaint and Harris's opposition papers suggest that he intends to bring other claims in addition to those listed, including ADA hostile work environment and retaliation claims; NYSHRL disability discrimination and failure to accommodate claims; NYSHRL and NYCHRL discrimination claims based on race, sex, and age; and NYSHRL and NYCHRL retaliation claims. (*See generally* Am. Compl., Dkt. 27; Opp'n, Dkt. 34.) The Court therefore addresses these claims as if Harris had included them in the Amended Complaint due to the Court's obligation to construe *pro se* complaints liberally. *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

[10] The timeliness issues raised in the motion are separate from the issue discussed *supra* at note 8, which has to do with the timeliness of Harris filing this lawsuit within 90 days of receiving his right-to-sue-letter from the EEOC. Namely, the DOHMH argues (1) that Harris's Title VII, ADEA, and ADA claims based on events that occurred more than 300 days prior to the date he filed his EEOC charge are time-barred, per 42 U.S.C. §§ 2000e-5(e)(1), 12117(a); and (2) that Harris's NYSHRL, NYCHRL, Section 1983, and EPA claims based on events that occurred more than two or three years prior to the date he filed the instant lawsuit are time-barred per the applicable statutes of limitations. (*See* Mem., Dkt. 35-5, at 7–8.)

Before a plaintiff can file a federal lawsuit for claims under Title VII or the ADEA, they must first exhaust their administrative remedies by filing a charge with the EEOC or an equivalent state or local agency. *See Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (Title VII); *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) ("*Legnani I*") (ADEA); *see also* 42 U.S.C. § 2000e-5(e)(1), (f)(1) (Title VII administrative exhaustion requirement); 29 U.S.C. § 626(d)(1) (ADEA administrative exhaustion requirement).[11] "Claims not raised in an EEOC complaint, however, may be brought in federal court if they are 'reasonably related' to the claim filed with the agency." *Williams*, 458 F.3d. at 70 (citation omitted). A claim is "reasonably related" if (1) "the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination"; (2) "it alleges retaliation for filing the EEOC charge"; or (3) "the plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Soules*, 882 F.3d at 57 (2d Cir. 2018) (quoting *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002)). "In determining whether claims are reasonably related, the focus should be on the factual allegations made in the EEOC charge itself." *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003) (citation modified).

Although Harris filed an EEOC charge in 2023, the DOHMH argues that that charge "merely allege[s] disability discrimination," and contains "no allegations concerning racial discrimination or age discrimination protected by Title VII and [the] ADEA." (Mem., Dkt. 35-5, at 6.) Harris concedes that his EEOC charge did not explicitly raise claims of race, sex, or age

---

[11] The same is true for ADA claims, *see Soules v. Conn., Dep't of Emergency Servs. & Pub. Prot.*, 882 F.3d 52, 57 (2d Cir. 2018); 42 U.S.C. § 12117 (ADA adopting same remedies and procedures as Title VII), but the DOHMH does not argue that Harris failed to exhaust his ADA claims, (*see* Mem., Dkt. 35-5, at 6). That argument is therefore waived. *See Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489–91 (2d Cir. 2018) (failure to exhaust administrative remedies is an affirmative defense, not a jurisdictional bar, and thus is subject to waiver if not pled).

discrimination, but nonetheless argues that the charge described allegations that were "reasonably related" to his claims under Title VII and the ADEA. (Opp'n, Dkt. 34, at ECF 6–7.)[12] Not so. Harris's August 2023 EEOC charge stated that the DOHMH had denied Harris's request for a disability accommodation, (*see* Exs., Dkt. 27-1, at ECF 1), and that Harris was locked out of the building for 15 minutes prior to his assigned start time, which Harris believed was evidence of disability discrimination, (*see id.* at ECF 2). In September 2023, Harris amended the EEOC charge to add allegations that the DOHMH had begun to retaliate against him because of the August 2023 charge. (*Id.* at ECF 4.) None of these factual allegations are reasonably related to the race, sex, and age discrimination claims Harris brings in this lawsuit. *See Littlejohn v. City of New York*, 795 F.3d 297, 322–23 (2d Cir. 2015) (holding that sex discrimination claims were not "reasonably related" to plaintiff's EEOC discrimination claims that were "based solely on race and color").

Harris also argues that he "previously filed an EEOC charge in 2017 . . . naming many of the same supervisory personnel." (Opp'n, Dkt. 34, at ECF 6.) But there are two problems with this argument. First, Harris did not file this lawsuit within 90 days of receiving a right-to-sue letter for the 2017 EEOC charge, as required for Title VII, *see In re AAM Holding Corp.*, 154 F.4th 252, 257 (2d Cir. 2025) (citing 42 U.S.C. § 2000e-5(f)(1); 29 C.F.R. § 1601.28(a), (e)), or within 90 days of the termination of the proceedings by the EEOC, as required for the ADEA, *see Hodge v. N.Y. Coll. of Podiatric Med.*, 157 F.3d 164, 168 (2d Cir. 1998) (citing 29 U.S.C. § 626(e)). Second, the charge to which Harris refers, Charge No. 520-2017-03706, (*see* Opp'n, Dkt. 34, at ECF 6),

---

[12] Harris also claims that his August 2023 EEOC charge described allegations that were reasonably related to his claims under the EPA, (Opp'n, Dkt. 34, at ECF 7), but administrative exhaustion is not a requirement under the EPA, *see Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 640, (2007) ("[T]he EPA does not require the filing of a charge with the EEOC." (citing 29 U.S.C. § 206(d))), *superseded by statute on other grounds by* Pub. L. No. 111-2, 123 Stat. 5 (amending 42 U.S.C. § 2000e–5(e)).

discusses only alleged retaliation for filing yet another previous EEOC charge; it does not raise claims that are related to discrimination on the basis of race, sex, age, or any other protected status. (*See* Exs., Dkt. 27-1, at ECF 51–52.)  The claims described in Harris's 2017 EEOC charge are also not "reasonably related" to the Title VII and ADEA claims raised in this lawsuit.

Therefore, Harris's claims under Title VII and the ADEA are dismissed due to Harris's failure to exhaust administrative remedies as to those claims.

### B.        *Res Judicata* Based on *Harris I* and Timeliness

The DOHMH next argues that "under principles of *res judicata*, [Harris] should be precluded from asserting claims . . . that either were raised and dismissed [in *Harris I*] or that could have been raised" in that case.  (Mem., Dkt. 35-5, at 6.)  The DOHMH specifically maintains that all of Harris's claims based on events that occurred before December 3, 2022 (the date Harris filed the amended complaint in *Harris I*) are precluded by *res judicata*.[13]  The Court agrees.

*Res judicata* is a judicial doctrine based on the principle that a plaintiff must "bring all claims at once against the same defendant relating to the same transaction or event."  *Soules*, 882 F.3d at 55 (quoting *N. Assur. Co. of Am. v. Square D Co.*, 201 F.3d 84, 88 (2d Cir. 2000)); *see also* 18 Wright & Miller's Federal Practice and Procedure § 4402 (3d ed. Sep. 2025) (under *res judicata*, a court's judgment is treated as "the full measure of relief to be accorded between the

---

[13] The "crucial date" for *res judicata* purposes is typically "the date the complaint was filed." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 400 F.3d 139, 141 (2d Cir. 2005) ("*Legnani II*") (quoting *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000)).  An amended complaint counts as a "complaint" for purposes of this rule.  *See Curtis*, 226 F.3d at 139–40 (holding that *res judicata* barred litigation of related events arising before, but not after, plaintiff's first *amended* complaint).  Thus, a plaintiff who files an amended complaint is generally obligated to bring their related claims that have accrued while the case has been pending in order to avoid later preclusion. *See Soules*, 882 F.3d at 56 (holding that *res judicata* barred litigation of post-complaint events because the district court "implicitly permitted [plaintiff] to amend the initial complaint" to include those events).

same parties and on the same claim" (citation and internal quotation marks omitted)).  Thus, *res judicata* "bars re-litigation if '(1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action.'"  *Soules*, 882 F.3d at 55 (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000)).

Here, the first two requirements are easily met.  *Harris I* involved the same parties as this lawsuit, and the case was dismissed under Rule 12(b)(6) for failure to state a claim, *see Harris I*, 2024 WL 1332684, at *1–2, 4, which is an adjudication on the merits, *Berrios v. New York City Hous. Auth.*, 564 F.3d 130, 134–35 (2d Cir. 2009) (citations omitted).[14]

As to the third requirement, the amended complaint in *Harris I* brought claims against the DOHMH under Title VII, the NYSHRL, and the NYCHRL for discrimination on the basis of race and sex.  Am. Compl. ¶¶ 1–3, 6, *Harris I*, Dkt. 38.  Harris also claimed that the DOHMH retaliated against him for engaging in protected activity under those statutes.  *Id.*  He alleged that in October 2021, the DOHMH had discriminatorily failed to promote him to Investigator, and that in April 2022, the DOHMH discriminatorily failed to promote him or notify him of vacancies for a Computer Associate position.  *Id.* ¶¶ 24–38.

All of Harris's claims based on those specific factual allegations are barred by *res judicata* because the claims were plainly raised in *Harris I*.  (*See* Am. Compl., Dkt. 27, at ECF 7–10 (describing same failures to promote him to Investigator and Computer Associate in 2021 and

---

[14] Harris argues that *Harris I* was not an adjudication on the merits because it was dismissed without prejudice "on procedural grounds[] after Plaintiff's counsel failed to amend the complaint or respond to the motion to dismiss." (Opp'n, Dkt. 34, at ECF 5.)  That is incorrect.  Harris's counsel in *Harris I* filed an opposition to the motion to dismiss, after which Judge DeArcy Hall dismissed the complaint.  *See* Pl.'s Mem. Supp. Opp'n to Def.'s Mot. to Dismiss, *Harris I*, Dkt. 44-2.

2022).)  It does not matter if Harris now applies different legal theories to the same factual allegations (e.g., alleging that the DOHMH failed to promote him based on disability discrimination rather than race or sex discrimination), because "proof of [those] claim[s] would depend upon substantially the same facts and evidence."  *See Reeves v. City of Yonkers*, No. 17-CV-5341 (KMK), 2019 WL 2602897, at \*5 (S.D.N.Y. June 25, 2019) (citation omitted and original alterations adopted).  Harris therefore could have, and should have, raised those alternative legal theories in *Harris I*.[15]

Similarly, all of Harris's claims based on *other* factual events that happened before December 3, 2022 are barred by *res judicata* because Harris could have, and should have, brought them in *Harris I*.  Considering "whether the underlying facts are related in time, space, origin, or motivation; . . . whether the underlying facts form a convenient trial unit; and . . . whether their treatment as a unit conforms to the parties' expectations," *Soules*, 882 F.3d at 55 (quoting *Channer v. Dep't of Homeland Sec.*, 527 F.3d 275, 280 (2d Cir. 2008)), the Court concludes that the factual allegations here are sufficiently related to those in *Harris I* and that the parties should have expected that all of Harris's discrimination and retaliation claims, for the same time period and against the same defendant, would be included in the same lawsuit.

However, Harris also now brings claims that are based on events that "occurred after" he filed his amended complaint in *Harris I* on December 3, 2022.  (*See* Am. Compl., Dkt. 27, at ECF 2.)  "[A]s a matter of logic, when [a] second action concerns a transaction occurring after" the plaintiff filed their complaint in the first action, *res judicata* generally does not apply.  *Legnani*

---

[15] The Court notes that Harris's amended complaint in *Harris I* states that it was filed "in order to add certain claims that arose out of the same nucleus of operative facts, and [to] assert[] a claim that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out— in the original pleading."  Am. Compl. ¶ 12, *Harris I*, Dkt. 38.  Thus, Harris seemingly understood, and sought to comply with, his obligation to bring all of his related claims at that time.

*II*, 400 F.3d at 141 (citation omitted) (first alteration in original).  The Court thus agrees with Harris that *res judicata* does not bar any of his claims that could not reasonably have been included in *Harris I* because they took place after December 3, 2022.  Harris can also rely on events prior to that date as "background evidence to support [his] timely claims" in the present lawsuit.  *Mitchell v. Planned Parenthood of Greater N.Y., Inc.*, 745 F. Supp. 3d 68, 88 (S.D.N.Y. 2024) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

Additionally, Harris brings some claims that are based on an alleged pattern of ongoing conduct, such as his hostile work environment claim.  (*See* Opp'n, Dkt. 34, at ECF 7); *see also Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 88 (2d Cir. 2024) (explaining that the "very nature" of hostile work environment claims "involves repeated conduct," and that such claims "continue[] to accrue, or reaccrue[], each time the defendant engages in an act that is 'part of the ongoing, discriminatory practice'" (first quoting *Morgan*, 536 U.S. at 115; and then quoting *King v. Aramark Servs., Inc.*, 96 F.4th 546, 561 (2d Cir. 2024)).  For purposes of *res judicata*, a claim asserted in a subsequent action is not barred if it is based on ongoing conduct and "relies on facts that occurred both before and after the earlier action commenced."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 501 (2d Cir. 2014) (citing *Waldman v. Village of Kiryas Joel*, 207 F.3d 105, 112 (2d Cir. 2000)).  This means that Harris's claims based on continuing conduct—such as his hostile work environment claim under the ADA and his discrimination claims under the NYSHRL and NYCHRL—may proceed, but only to the extent they are based on at least one event that occurred after December 3, 2022.  *See id.*  (quoting *Waldman*, 207 F.3d at 112).[16]

---

[16] The NYCHRL "does not distinguish between claims of 'discrimination' and 'harassment' or hostile work environment, which is a term of art borrowed from the more restrictive Title VII jurisprudence."  *Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 287 n.6 (S.D.N.Y. 2024) (quoting *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 452 n.3 (S.D.N.Y. 2024)).  The

The DOHMH also argues that Harris's claims are partially time-barred by statutes of limitations. (Mem., Dkt. 35-5, at 7–8.) However, the time bar imposed by *res judicata* cuts Harris's claims shorter than any of the applicable statutes of limitations.[17] Since the Court agrees with the DOHMH on its *res judicata* argument, the statute of limitations argument is moot.

---

NYSHRL has a similar standard to the NYCHRL for claims that accrued after the NYSHRL's 2019 amendment. *See Wellner v. Montefiore Med. Ctr.*, No. 17-CV-3479 (KPF), 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019); N.Y. Exec. Law § 300.

[17] Harris's claims under the NYSHRL and NYCHRL are subject to a three-year statute of limitations, and that statute of limitations may be further tolled for the time when his charge was pending before an administrative body such as the EEOC or SDHR. N.Y. C.P.L.R. § 214(2); N.Y. Exec. Law § 297(9); N.Y.C. Admin. Code § 8-502(d); *accord Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 248−49 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 208 (E.D.N.Y. 2014). Harris's FMLA and EPA claims are subject to a two-year statute of limitations, which can be extended to three years for willful violations. 29 U.S.C. § 2617(c)(1)–(2); 29 U.S.C. § 255(a); *accord Porter v. N.Y. Univ. Sch. of Law*, 392 F.3d 530, 531 (2d Cir. 2004) (per curiam) (FMLA); *Jamilik v. Yale Univ.*, 362 F. App'x 148, 150 (2d Cir. 2009) (summary order) (EPA). Harris's Section 1983 claims are subject to a three-year statute of limitations. *Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 108 (2d Cir. 2023) (first citing N.Y. C.P.L.R. § 214(5); and then citing *Lucente v. County of Suffolk*, 980 F.3d 284, 308 (2d Cir. 2020)). Finally, Harris's ADA claims must have been brought to the EEOC within 300 days of the alleged violative conduct. 42 U.S.C. § 11217(a) (adopting procedural requirements of Title VII, including 42 U.S.C. § 2000e-5(e)(1), for ADA claims); *accord De Figueroa v. New York*, 403 F. Supp. 3d 133, 159 (E.D.N.Y. 2019); *Tiberio v. Allergy Asthma Immunology of Rochester*, 664 F.3d 35, 38 (2d Cir. 2011).

Here, Harris filed his administrative charge with the SDHR/EEOC on August 9, 2023, (Am. Compl., Dkt. 27, at ECF 3), which was pending for 223 days before he received his right-to-sue letter, (*see* Exs., Dkt. 27-1, at ECF 7). He filed this suit on June 19, 2024. (Compl., Dkt. 2.) The statutes of limitations described above result in start dates ranging from October 29, 2020 (for Harris's NYSHRL and NYCHRL claims), to October 13, 2022 (for Harris's ADA claims). Because the Court finds that all of Harris's claims that accrued before December 3, 2022 are barred by *res judicata*, the impact of these statutes of limitations on Harris's claims is moot.

15

## II.      Failure to State a Claim Under Rule 12(b)(6)

For Harris's remaining claims—those under the FMLA, ADA, EPA, Section 1983, NYSHRL, and NYCHRL that accrued after December 3, 2022—the Court reviews the Amended Complaint pursuant to Rule 12(b)(6).

### A.      Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

In addressing the sufficiency of a complaint, courts are required to accept the well-pleaded factual allegations contained in the complaint as true. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 123 (2d Cir. 2010) (citing *Iqbal*, 556 U.S. at 678–79); *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quoting *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009)), *aff'd*, 569 U.S. 108 (2013); *Stern v. Rocket Mortg., LLC*, 666 F. Supp. 3d 234, 238 n.2 (E.D.N.Y. 2023) (citing *Kiobel*, 621 F.3d at 123). However, the Court "need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

16

*Pro se* complaints are held to less stringent standards than pleadings drafted by attorneys, so the Court reads a plaintiff's *pro se* complaint liberally and interprets it to raise the strongest arguments and claims it suggests. *Hill*, 657 F.3d at 122 (citing *Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009)); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (per curiam) ("This policy of liberally construing *pro se* submissions is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" (alteration in original) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983))).  Additionally, "[o]n a motion to dismiss, the Court may consider allegations that are contained in a *pro se* plaintiff's opposition papers" in addition to the allegations in the complaint.  *Kauffman*, 762 F. Supp. 3d at 314 n.5 (citing *Burgess v. Goord*, No. 98-CV-2077 (SAS), 1999 WL 33458, at *1 n.1 (S.D.N.Y. Jan. 26, 1999) (collecting cases)).

**B.     Harris's FMLA Claims are Dismissed**

Harris brings claims for FMLA interference and retaliation.  (Am. Compl., Dkt. 27, at ECF 14–15.)  For the reasons discussed below, both claims are dismissed under Rule 12(b)(6).

1.     Interference

The FMLA entitles eligible employees to take up to 12 weeks of unpaid leave during any 12-month period for certain qualifying reasons, including "[i]n order to care for the spouse, or a son, daughter, or parent[] of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. § 2612(a)(1)(C).  The FMLA also makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise[] any right provided" under the statute.  *Id.* § 2615(a)(1).  To succeed on a claim for FMLA interference, a plaintiff must show that the defendant "denied or otherwise interfered with a benefit to which [the plaintiff] was

17

entitled under the FMLA."  *Kemp v. Regeneron Pharms., Inc.*, 117 F.4th 63, 69 (2d Cir. 2024) (emphasis omitted) (quoting *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016)).

Here, based on Harris's own submissions, he has not stated a plausible claim for FMLA interference.  Although Harris asserts that he "requested leave under [the] FMLA" in 2023, (Am. Compl., Dkt. 27, at ECF 14), that statement is contradicted by the more specific facts he alleges and the exhibits he has provided.  (*See id.* at 5–6 (stating only that Harris submitted requests to *telework*); *id.* at 14 (stating that the DOHMH "would not approve Plaintiff's request for *retroactive annual leave*" but told him that he could submit a request for FMLA leave which would then be applied retroactively to remove Harris from AWOL status (emphasis added)); Exs., Dkt. 27-1, at ECF 20 (April 2025 email from Harris to the DOHMH's representative requesting telework and explicitly stating that he did not want to take FMLA leave because it would "exhaust [his] time and cause . . . problems").)  "The Court is not required to accept as true the allegations in the Complaint[] in the face of documents that state otherwise."  *Sosa v. N.Y.C. Dep't of Educ.*, 368 F. Supp. 3d 489, 524 (E.D.N.Y. 2019) (citing *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 399–400 (S.D.N.Y. 2002)); *see also Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410 (MKB) (RER), 2016 WL 3647687, at *5 (E.D.N.Y. July 1, 2016) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." (quoting *Poindexter v. EMI Record Grp. Inc.*, No. 11-CV-0559 (LTS) (JLC), 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012))).

It is true that Harris is not required to show that he actually *requested* or *took* FMLA leave in order to state a claim for interference.  *See Kemp*, 117 F.4th at 69.  But he must, at minimum, show that the DOHMH discouraged him from exercising his FMLA rights in some way.  *See id.* Harris has not done so.  If anything, he has stated facts showing that the DOHMH encouraged him

to take FMLA leave and tried to help him navigate the process. (*See* Exs., Dkt. 27-1, at ECF 22 (August 2023 email from the DOHMH's representative explaining that Harris could take FMLA leave by submitting the agency's required forms); *id.* at ECF 23 (September 2023 email from the DOHMH's representative emphasizing that Harris could submit documentation requesting FMLA leave retroactively, which would allow the DOHMH to remove Harris's AWOL designation).)

Thus, because Harris has not stated an FMLA interference claim that is plausible on its face, that claim is dismissed.

### 2. Retaliation

While an FMLA interference claim arises when an employer "has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA," an FMLA retaliation claim, in contrast, "involve[s] an employee actually exercising [their] rights or opposing perceived unlawful conduct under the FMLA and then being subjected to some adverse employment action by the employer." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017) (first citing *Graziadio*, 817 F.3d at 424; and then citing *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam)). In other words, an FMLA interference claim provides protection "*ex ante*" (i.e., before the event), while a retaliation claim provides protection "*ex post*" (i.e., after). *Id.*

"Courts in this circuit analyze FMLA retaliation claims, at the evidentiary stage, under the *McDonnell Douglas* burden-shifting framework." *Robles v. Medisys Health Network, Inc.*, No. 19-CV-6651 (ARR) (RML), 2020 WL 3403191, at *18 (E.D.N.Y. June 19, 2020) (citing *Graziadio*, 817 F.3d at 429). In order for a plaintiff to make out a prima facie case at the first step of that framework, they must establish that: (1) they "exercised rights protected under the FMLA"; (2) they were "qualified for [their] position"; (3) they "suffered an adverse employment action"; and (4) "the adverse employment action occurred under circumstances giving rise to an inference

19

of retaliatory intent." *Potenza*, 365 F.3d at 168. "[A] plaintiff does not need to plead specific facts establishing a prima facie case of [FMLA retaliation] in order to survive a motion to dismiss." *Robles*, 2020 WL 3403191, at *18 (citation and internal quotation marks omitted). Nonetheless, to determine whether a plaintiff has stated a plausible claim for relief, the Court may look to the elements of the prima facie case. *Id.*

Here, Harris alleges that the DOHMH engaged in retaliation "for [his] prior use of FMLA leave" by "penaliz[ing] [him] with AWOL status" during his period of absence in 2023. (Am. Compl., Dkt. 27, at ECF 14.) He also alleges that he was "[e]xcluded from the agency's remote work program upon [his] return; [d]enied flexibility or reassignment, unlike comparators; [and] [s]ubjected to hostile and dismissive communication from HR and management." (Opp'n, Dkt. 34, at ECF 24.) As established above, Harris has not sufficiently alleged that he took or attempted to take FMLA leave during his 2023 period of absence, or that he was improperly denied FMLA leave for that absence. Nor has Harris alleged that he suffered retaliation because he opposed any conduct he perceived as unlawful under the FMLA. (*See generally* Am. Compl., Dkt. 27; Opp'n, Dkt. 34, at ECF 23–26.) Harris therefore did not "exercise[] rights protected under the FMLA," and so he cannot plausibly state a claim for FMLA retaliation. *See Potenza*, 365 F.3d at 168.

Harris's FMLA retaliation claim is therefore dismissed.

### C.    Harris's ADA Claims are Dismissed in Part

Harris brings claims for failure to accommodate and disability discrimination under the ADA. (Am. Compl., Dkt. 27, at ECF 12.) Harris alleges as his disability that he "suffers from Types 2 diabetes, which substantially limits one or more major life activities, including endocrine function," and that he "also experienced additional physical impairments [during the relevant time frame], including a hernia and broken finger, which temporarily limited his ability to perform certain physical work tasks." (*Id.*) While Harris's Amended Complaint does not explicitly plead

20

claims for hostile work environment or retaliation under the ADA, he generally suggests, in the Amended Complaint and his opposition to the DOHMH's motion, that he was subjected to a hostile work environment and retaliation under the ADA.  (*See* Am. Compl., Dkt. 27, at ECF 2–3, 11; Opp'n, Dkt. 34, at ECF 1, 9–10.)  Since Harris is proceeding *pro se*, the Court must construe his amended complaint to include any viable claims it suggests, and therefore includes ADA hostile work environment and retaliation claims in its analysis.

As set forth below, Harris's ADA claim for failure to accommodate will proceed.  His ADA claims for disability discrimination, hostile work environment, and retaliation, however, are dismissed.

### 1.    Failure to Accommodate

Harris alleges that the DOHMH failed to provide him with reasonable accommodations for his disability and failed to engage in an interactive process.  (*See* Am. Compl., Dkt. 27, at ECF 12.)  Because there is no independent cause of action for failure to engage in the interactive process under the ADA, *see McSweeney v. Cohen*, 776 F. Supp. 3d 200, 249 (S.D.N.Y. 2025) (citation omitted), the Court analyzes Harris's claim for refusal to engage in the interactive process as part of his failure-to-accommodate claim.  *See, e.g.*, *Robles*, 2020 WL 3403191, at *11 (doing same).

Title I of the ADA prohibits a covered employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discriminating against an individual based on disability includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is . . . an employee," unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business."  *Id.* § 12112(b)(5)(A).  Thus, to state an ADA claim for failure to accommodate, a plaintiff must allege that: (1) their employer is subject to the ADA; (2) they were

disabled within the meaning of the ADA; (3) they were otherwise qualified to perform the essential functions of their job, with or without reasonable accommodation; and (4) their employer refused to make a reasonable accommodation. *Tudor v. Whitehall Cent. Sch. Dist.*, 132 F.4th 242, 246 (2d Cir. 2025) (quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (per curiam)).

The DOHMH argues that Harris fails to meet the second element because he does not establish that he was disabled within the meaning of the ADA. (*See* Mem., Dkt. 35-5, at 12–14; Reply, Dkt. 36-3, at 6–7.) The ADA defines a disability as a "physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1)(A).[18] The statute includes a non-exhaustive list of major life activities: "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). Additionally, "a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, *endocrine*, and reproductive functions." *Id.* § 12102(2)(B) (emphasis added). The EEOC regulations promulgated under the ADA instruct that "'[s]ubstantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). For example, under those regulations, an impairment does not need to "prevent, or significantly or severely restrict," a major life activity for it to be considered "substantially limiting." *Id.* § 1630.2(j)(1)(iii). Those regulations comport with the broad remedial purpose of the ADA, under which the definition of "disability" is meant to be

---

[18] The ADA definition of disability also includes an individual with "a record of such an impairment; or . . . being regarded as having such an impairment." 42 U.S.C. § 12102(1)(B)–(C).

construed "in favor of broad coverage . . . to the maximum extent permitted" by the terms of the statute. 42 U.S.C. § 12102(4)(A).

Harris has sufficiently alleged that he was disabled within the meaning of the ADA. He has provided specific examples of how his Type 2 diabetes "substantially limit[s] one or more major life activities," including his endocrine system function. (Opp'n, Dkt. 34, at ECF 16); *see also* 29 C.F.R. § 1630.2(j)(3)(ii)–(iii) (instructing that certain impairments will "virtually always be found to impose a substantial limitation on a major life activity," including diabetes, which "substantially limits endocrine function"). Harris has also pleaded that the 2023 fracture to his finger impaired his ability to type on the computer, scan documents, handle files, and conduct electronic conversions, all of which he claims were part of his job duties. (Am. Compl., Dkt. 27, at ECF 5, 12; Opp'n, Dkt. 34, at ECF 18.) These allegations support a plausible inference that Harris qualified as an individual who has a "disability" within the meaning of the ADA during the relevant time frame.

"When an employer knew or reasonably should have known that an employee was disabled, its obligation was to engage in the interactive process—that is, to work with the employee to assess whether the employee's disability can be reasonably accommodated." *Robles*, 2020 WL 3403191, at *10 (citation modified) (quoting *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135–36 (2d Cir. 2008)). An employer's failure to engage in the interactive process can form the basis for a failure-to-accommodate claim as long as "there was a reasonable accommodation that would have enabled the employee to perform the essential functions of [their] job."[19] *Id.* at *10 n.8 (citing

---

[19] The DOHMH argues that "failure to engage in [a] good faith interactive process does not form the basis of a claim pursuant to the ADA." (Mem., Dkt. 35-5, at 14 (citing *Sheng v. M&TBank Corp.*, 848 F.3d 78, 86–87 (2d Cir. 2017)).) It is correct that there is no independent cause of action for failure to engage in an interactive process under the ADA, *see McSweeney*, 776

*McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 100–01 (2d Cir. 2009)).   The DOHMH argues that Harris's exhibits show that the DOHMH engaged in an interactive process because the DOHMH considered Harris's requests for accommodations and explained its reasons for denying them.   (*See* Mem., Dkt. 35-5, at 13–14 (citing Exs., Dkt. 27-1, at ECF 11, 15).)   Harris contends that the DOHMH's responses were not an interactive dialogue but rather "perfunctory dismissals" that did not represent a "good-faith exchange."   (Sur-Reply, Dkt. 40, at ECF 1.)   For example, Harris states that the DOHMH denied his request for accommodations related to his diabetes on the grounds that the DOHMH had previously denied his request for accommodations related to his broken finger.   (Am. Compl., Dkt. 27, at ECF 5.)   Harris's allegations support the plausible inference that the DOHMH failed to engage in an interactive process, which supports Harris's failure-to-accommodate claim.

Finally, under the fourth element of a failure-to-accommodate claim, Harris has sufficiently alleged that the DOHMH refused to make reasonable accommodations.   (*See* Am. Compl., Dkt. 27, at ECF 5, 12; Opp'n, Dkt. 34, at ECF 20.)   The ADA defines the term "reasonable accommodation" as including (but not limited to) "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."   42 U.S.C. § 12111(9)(B).

Here, Harris states that he requested, and the DOHMH denied, "flexible scheduling and [t]elework as needed for diabetes management, including the ability to eat and rest on a predictable

---

F. Supp. 3d at 249, but in *Sheng*, the Second Circuit made clear that an employer's failure to engage in the interactive process can be "evidence tending to show . . . that the employer has refused to make a reasonable accommodation."   *Sheng*, 848 F.3d at 87 (citation modified) (collecting cases).

schedule and to avoid hypoglycemic episodes," and telework following his hernia surgery and after he broke his finger. (Opp'n, Dkt. 34, at ECF 20.) The DOHMH neither disputes that it denied all of Harris's cited accommodation requests nor argues that the requests were unreasonable. (*See generally* Mem., Dkt. 35-5; Reply, Dkt. 36-3.)

Harris's allegations are sufficient, at this stage, to plead that the DOHMH failed to make the "reasonable" accommodations Harris requested. To determine whether an accommodation is reasonable, it "will normally require some development of a factual record" because it is a highly fact-specific inquiry that must consider the needs of both the employee and the employer. *See Lyons v. Legal Aid Soc.*, 68 F.3d 1512, 1516 (2d Cir. 1995); *cf. Austin v. Town of Farmington*, 826 F.3d 622, 629–30 (2d Cir. 2016) (reasonableness of proposed accommodation under the Fair Housing Act could not be decided on the pleadings because "the relevant factors are numerous and balancing them requires a full evidentiary record"). As such, the Court is ill-suited to determine whether Harris's proposed accommodations are "reasonable" on a motion to dismiss. *See Lyons*, 68 F.3d at 1517 (holding that "in light of the need to develop a factual record, it was inappropriate to dismiss the complaint" alleging failure to provide reasonable accommodation under Rule 12(b)(6)). Harris has raised at least a plausible inference that his requests for accommodations, such as his requests for flexible scheduling and telework, were reasonable. *See, e.g.*, *Ray v. Weit*, 708 F. App'x 719, 722 (2d Cir. 2017) (summary order) (explaining that "physical presence at or by a specific time is not, as a matter of law, an essential function of all employment" and that "reasonable accommodations" can include a modified work schedule "if it does not involve the elimination of an essential job function" (citations omitted)).

Because Harris has plausibly alleged that he was disabled within the meaning of the ADA and that his employer failed to make reasonable accommodations he requested, his ADA failure-to-accommodate claim will proceed to discovery.

### 2.    Disability Discrimination and Retaliation

"'Claims alleging disability discrimination in violation of the ADA are subject to the [*McDonnell Douglas*] burden-shifting analysis' at the evidentiary stage of litigation." *Robles*, 2020 WL 3403191, at *5 (alteration in original) (quoting *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013)).  To state a prima facie case of ADA disability discrimination under that framework, a plaintiff must show that: (1) their "employer is subject to the ADA"; (2) the plaintiff was "disabled within the meaning of the ADA"; (3) they were "otherwise qualified to perform the essential functions of [their] job, with or without reasonable accommodation"; and (4) they "suffered [an] adverse employment action because of disability." *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 71 (2d Cir. 2019) (quoting *McMillan*, 711 F.3d at 125).  For a discrimination claim, a plaintiff establishes that they suffered an adverse action as long as they show "some harm respecting an identifiable term or condition of employment." *See Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024) (Title VII context); *Mitchell*, 745 F. Supp. 3d at 91 (holding that *Muldrow*'s definition applies to ADA discrimination claims and collecting cases).

"Like discrimination claims, [ADA] retaliation claims are analyzed using the *McDonnell Douglas* burden-shifting framework." *Frantti v. New York*, 850 F. App'x 17, 21 (2d Cir. 2021) (summary order) (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001)).  To establish a prima facie case of ADA retaliation, a plaintiff must show that: (1) they "engaged in an activity protected by the ADA"; (2) "the employer was aware of this activity"; (3) "the employer took adverse employment action against [the plaintiff]"; and (4) "a causal connection exists between the alleged adverse action and the protected activity." *Id.* (quoting

*Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002)).  In the retaliation context, an adverse action is "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Sharikov v. Philips Med. Sys. MR, Inc.*, 103 F.4th 159, 170 (2d Cir. 2024) (first quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015); and then citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999)).  The adverse-action standard for retaliation claims is meant to "cover[] a broader range of conduct than does the adverse-action standard for claims of discrimination."  *Id.* (quoting *Vega*, 801 F.3d at 90).

The DOHMH does not dispute that it is an employer subject to the ADA, or that Harris was qualified to perform the essential functions of his job.  (*See generally* Mem., Dkt 35-5; Reply, Dkt. 36-3.)  Although the DOHMH argues that Harris has failed to sufficiently allege that he was disabled within the meaning of the ADA, (*see* Mem., Dkt. 35-5, at 12–13), the Court disagrees, as discussed above.  That leaves the questions of (1) whether Harris suffered any adverse actions, (2) whether he engaged in any protected activities, and (3) whether the adverse actions were *because of* his disability status or his protected activities.

First, for both his ADA discrimination and retaliation claims, Harris has plausibly alleged that he suffered adverse actions.  Although some are barred by *res judicata*,[20] he adequately alleges

---

[20] Harris alleges that he suffered adverse actions when he was denied promotions between 2016 and 2021, and demoted and involuntarily transferred to another office in 2017. (Am. Compl., Dkt. 27, at ECF 9–10; Opp'n, Dkt. 34, at ECF 13.)  Because those events all occurred before he filed his amended complaint in *Harris I*, they are barred by *res judicata* and cannot be considered adverse actions in themselves, as discussed above.  However, to the extent Harris asserts that these incidents "establish a continuing pattern of discriminatory conduct," (Am. Compl., Dkt. 27, at ECF 2), the Court will consider them as allegations supporting Harris's hostile work environment claim.  *See Tassy v. Buttigieg*, 51 F.4th 521, 530 (2d Cir. 2022) (Title VII discrimination claims are properly analyzed either as either "discrete act" claims or hostile work environment claims); *cf. King*, 96 F.4th at 560 (explaining that, under Title VII's continuing violation doctrine, an

several adverse actions that post-date *Harris I*.  For example, he claims that in 2023, he was denied

disability accommodations,[21] excluded from the agency's remote work program, and placed on

AWOL status without pay.  (*See* Am. Compl., Dkt. 27, at ECF  5–6; Opp'n, Dkt. 34, at ECF 13.)

Taken as true, these allegations sufficiently state that Harris suffered harm in the terms and

conditions of his employment.

Second, for his retaliation claim, Harris has adequately alleged that he engaged in protected

activities and that his employer was aware of such activities.  For instance, he submitted EEOC

complaints alleging disability discrimination and retaliation in August and September 2023, which

the EEOC provided to the DOHMH.  (Exs., Dkt. 27-1, at ECF 1–4; Opp'n, Dkt. 34, at ECF 22);

*see also Lovejoy-Wilson*, 263 F.3d at 223 (filing an EEOC complaint is "an activity protected by

the ADA" (citing *Sarno*, 183 F.3d at 159)).  Harris also made requests to the DOHMH for disability

---

"untimely discrete act claim," like a failure to promote, "cannot be pulled into the limitations period by a claim premised on a continuing course of conduct," like a hostile work environment claim, "even if the course of conduct includes that discrete act"; however, an untimely failure to promote claim can serve as evidence to support a timely hostile work environment claim (citations omitted)).

[21] Prior to *Muldrow*, courts in this Circuit, including this Court, generally held that a denial of a request for disability accommodations is not an adverse employment action.  *See, e.g.*, *Fox*, 918 F.3d at 72; *Sherman v. County of Suffolk*, 71 F. Supp. 3d 332, 345 (E.D.N.Y. 2014) (citation omitted); *Sosa*, 368 F. Supp. 3d at 496 (citing *Sherman*, 71 F. Supp. 3d at 345); *Shields v. N.Y.C. Health & Hosps. Corp.*, 489 F. Supp. 3d 155, 165 n.4 (E.D.N.Y. 2020) (citing *Fox*, 918 F.3d at 72); *Timmer v. City U. of N.Y.*, No. 20-CV-02554 (PKC) (RLM), 2021 WL 3603465, at *5 (E.D.N.Y. Aug. 13, 2021) (citing *Sosa*, 368 F. Supp. 3d at 496); *Kirkland-Hudson v. Mt. Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 457 (S.D.N.Y. 2023) (citations omitted).  But *Muldrow* lowered the standard for what constitutes adverse action, so this Court declines to follow the reasoning of those pre-*Muldrow* cases.  *See Mitchell*, 745 F. Supp. 3d at 91 ("To the extent that pre-*Muldrow* decisions imposed a higher threshold for finding an adverse employment action, those decisions appear to no longer be good law." (citing *Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 54 n.36 (2d Cir. 2024))).  Post-*Muldrow*, this Court holds that a denial of an accommodations request can be an adverse action on its own.  *See Satina v. City of New York*, No. 24-CV-1842 (JGLC), 2025 WL 902893, at *5 (S.D.N.Y. Mar. 25, 2025) (holding same).

accommodations between March and May 2023.  (Am. Compl., Dkt. 27, at ECF 5–6); *see also McSweeney*, 776 F. Supp. 3d at 251 ("[M]aking a good faith request for an accommodation is a protected activity.").

However, Harris has not established that the DOHMH took the alleged adverse actions against him *because of* his disability or protected activity, as required for his discrimination and retaliation claims respectively.  To be sure, a plaintiff does not need "substantial evidence" of intent at the motion-to-dismiss stage, but the plaintiff must still satisfy "a *minimal* burden of showing facts suggesting an inference" of discriminatory or retaliatory motivation. *Littlejohn*, 795 F.3d at 311 (in Title VII context) (citation omitted).  Even given this minimal burden, the Court cannot infer from the Amended Complaint that any of the DOHMH's actions were taken for a discriminatory or retaliatory purpose.  Harris's conclusory assertions are simply not sufficient. *See Timmer*, 2021 WL 3603465, at *6 ("Naked assertions of discrimination without any specific factual allegation of a causal link between the defendants' conduct and the plaintiff's protected characteristic are too conclusory to withstand a motion to dismiss." (quoting *Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 220 (E.D.N.Y. 2018))).

Harris argues that the Court can infer intent because of the temporal proximity between his return to the office on September 13, 2023 and his exclusion from the remote work program from that date until November 1, 2023.  (Opp'n, Dkt. 34, at ECF 12.)[22]  Similarly, Harris argues that the

---

[22] The Court notes that temporal proximity should be judged by when the DOHMH became aware of Harris's disability (for the discrimination claim) or his last protected activity (for the retaliation claim). *See Baron v. Adv. Asset and Prop. Mgt. Sols., LLC*, 15 F. Supp. 3d 274, 283 (E.D.N.Y. 2014) (measuring temporal proximity in ADA discrimination case as the time between "an employee's disclosure of a disability" and the adverse action—there, termination; *Infantolino v. Jt. Indus. Bd. of Elec. Indus.*, 582 F. Supp. 2d 351, 359 (E.D.N.Y. 2008) (measuring temporal proximity in ADA retaliation case as the time between the date that "plaintiff last engaged in protected activity" and the date of the alleged retaliation).  Here, the DOHMH was aware of

Court can infer intent because of the temporal proximity between his accommodations and leave requests and the DOHMH designating him AWOL and ceasing to pay him. (*See* Opp'n, Dkt. 34, at ECF 14.) However, even at the motion-to-dismiss stage, the Court "exercise[s] [its] judgment about the permissible inferences that can be drawn from temporal proximity" in the context of each case. *Riddle v. Citigroup*, 640 F. App'x 77, 79 (2d Cir. 2016) (summary order) (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)). The inferences Harris seeks are implausible. Regarding the remote work program, the Court notes that Harris spent the majority of 2023 working remotely (or, it appears, not working at all), and the DOHMH's remote work program required employees to work for at least some period of time in the office before being eligible to work remotely. (*See* Exs., Dkt. 27-1, at ECF 22 (email to Harris from a DOHMH representative on August 18, 2023, explaining that he is "not eligible for telework until [he is] at work exhibiting the ability to perform [his] duties," but that Harris hadn't been at work for "many months").) Additionally, Harris was allowed to participate in the remote work program within two months of his return to the office in September 2023. Although the Court must draw any *permissible* inferences in Harris's favor, these facts do not support a plausible inference of improper motive on the DOHMH's part based on temporal proximity alone.

Indeed, the only plausible inference about why the DOHMH designated Harris AWOL and stopped paying him is that Harris had not shown up for work, either remotely or in-person, for "many months." (*See* Am. Compl., Dkt. 27, at ECF 4–6 (stating that Harris received approved telework accommodations from February 10, 2023, to March 20, 2023; that he requested to keep

---

Harris's disability at least as of March 2023. (*See* Am. Compl., Dkt. 27, at ECF 5.) Harris's last protected activity prior to the alleged adverse action (exclusion from the remote work program starting September 13, 2023) appears to be the EEOC complaint he made on September 6, 2023. (*See id.* at ECF 2–3; Exs., Dkt. 27-1, at ECF 4.)

teleworking after March 20, 2023, but those requests were denied; and that he "returned to work on September 13, 2023"); *see also* Exs., Dkt. 27-1, at ECF 22 (email from the DOHMH's representative to Harris on August 18, 2023, stating that Harris "[hadn't] been at work for many months").)  In fact, the DOHMH made clear that it could remove the AWOL designation once Harris submitted a request for FMLA leave, which Harris did not do.  (*See* Exs., Dkt. 27-1, at ECF 23.)  Again, these facts prevent the Court from drawing even a minimal inference that the DOHMH acted with a discriminatory or retaliatory motive with respect to Harris's claimed disability.

Next, Harris argues that the Court can infer intent because he has alleged disparate treatment compared to non-disabled colleagues.  (*See* Opp'n, Dkt. 34, at ECF 12.)  "To establish an inference of discrimination" based on disparate treatment, "a plaintiff must allege that [they were] similarly situated in all material respects to the individuals with whom [they] seek[] to compare [themselves]." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 230 (2d Cir. 2014) (citation omitted).  Harris's assertions in this regard are too conclusory for the Court to credit.  (*See, e.g.*, Opp'n, Dkt. 34, at ECF 12 ("[C]omparators outside Plaintiff's protected classes (female and/or non-disabled employees) were . . . approved for [t]elework while Plaintiff was systematically excluded."); Am. Compl., Dkt. 27, at ECF 6 ("Plaintiff was treated less favorably than similarly situated employees who were granted accommodations for medical conditions or care-giver responsibilities.")).  Harris fails to allege any facts to support these assertions, and the Court cannot plausibly infer intent based on conclusory assertions alone.  *See Domen v. Vimeo, Inc.*, No. 20-616-CV, 2021 WL 4352312, at *4 (2d Cir. Sep. 24, 2021) (summary order) ("[B]are-bones, conclusory allegations of supposedly 'similarly situated' comparators . . . fail to raise an inference

31

of discriminatory intent." (quoting *Smith v. City of New York*, 385 F. Supp. 3d 323, 332 (S.D.N.Y. 2019))).

Because Harris has not stated facts that would allow the Court to plausibly infer that the DOHMH acted with any improper motive, his ADA disability discrimination and retaliation claims must be dismissed. *See Wickland v. Archcare at Terrance Cardinal Cooke Health Care Ctr.*, No. 23-CV-02735 (OEM) (SJB), 2024 WL 3432029, at *6 (E.D.N.Y. July 15, 2024) (dismissing ADA discrimination and retaliation claims where plaintiff failed to provide evidence of causation) (citation omitted).

### 3. Hostile Work Environment

"To prevail on a hostile work environment claim under the ADA, a plaintiff must show (1) that the harassment was sufficiently severe or pervasive to alter the conditions of [their] employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *McSweeney*, 776 F. Supp. 3d at 245 (internal quotation marks omitted) (quoting *Alfano*, 294 F.3d at 373). Under the first element, a plaintiff must show that the harassment was both subjectively and objectively severe or pervasive. *See id.* ("Although the victim must subjectively perceive the conduct as abusive, the misconduct shown also must be severe or pervasive enough to create an objectively hostile or abusive work environment." (internal quotation marks omitted) (quoting *Fox*, 918 F.3d at 74)).

Importantly, "a hostile work environment under . . . the ADA requires a plaintiff to show that the complained-of conduct creates such an environment because of the plaintiff's membership in a protected class." *Arkorful v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 3d 336, 359 (E.D.N.Y. 2024) (internal quotation marks omitted and alterations adopted) (citing *Dollinger v. N.Y. State Ins. Fund*, 726 F. App'x 828, 831 (2d Cir. 2018) (summary order)); *see also Alfano*, 294 F.3d at 377 ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability . . . . It is

therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." (collecting cases)).

Here, again, Harris has failed to plead a connection between the DOHMH's alleged conduct and his disability. The Court reaches this conclusion despite also considering Harris's allegations that are otherwise barred by *res judicata*, since a hostile work environment claim, based on a continuing course of conduct, can properly include those events. Although Harris alleges that he was denied promotions between 2016 and 2021, and that he was demoted and involuntarily transferred in 2017, he does not allege that the DOHMH made any comments about Harris's disability or otherwise displayed any indicia of a discriminatory motive. (*See* Am. Compl., Dkt. 27, at ECF 9–10; Opp'n, Dkt. 34, at ECF 13.) And although he alleges that there were comparators who were treated more favorably, he still does not provide any evidence, beyond conclusory assertions, that those comparators were similarly situated. (*See generally* Am. Compl., Dkt. 27, at ECF 9–10; Opp'n, Dkt. 34, at ECF 12); *see Domen*, 2021 WL 4352312, at *4 (finding that conclusory allegations of similarly situated comparators does not raise inference of discriminatory intent). Thus, even assuming for the sake of argument that Harris has sufficiently alleged that his work environment was subjectively and objectively abusive, Harris has failed to present any factual allegations from which the Court could infer discriminatory animus.

Because the Court cannot plausibly infer that Harris was subjected to an abusive work environment because of his disability, his hostile work environment claim under the ADA is dismissed.

**D.**      **Harris's Equal Pay Act Claim is Dismissed**

Harris brings a claim under the EPA, alleging that the DOHMH paid him less than his female coworkers on the basis of his sex. (Am. Compl., Dkt. 27, at ECF 17–18.) This claim is dismissed.

Congress's purpose in enacting the EPA was to remedy the "ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same." *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (quoting S. Rep. No. 176, 88th Cong., 1st Sess., 1 (1963)); *see also EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) ("Congress passed the EPA in 1963 'to legislate out of existence a long-held, but outmoded societal view that a man should be paid more than a woman for the same work.'" (quoting *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000))). Despite its original purpose, since its passage, the EPA has been applied to situations where male plaintiffs claim that they are being unfairly paid less than their female counterparts. *See, e.g.*, *Volpe v. Nassau County*, 915 F. Supp. 2d 284, 293–94 (E.D.N.Y. 2013). In order to state a claim under the EPA, a plaintiff must plausibly allege that: "(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." *Port Auth. of N.Y. & N.J.*, 768 F.3d at 254–55 (citation modified) (quoting *Belfi*, 191 F.3d at 135); *accord* 29 U.S.C. § 206(d)(1). Unlike Title VII and ADA claims, EPA claims do not require proof of discriminatory intent. *See Belfi*, 191 F.3d at 136.

As the Second Circuit has observed, the EPA requires "equal pay for—emphatically— *equal* work," and "[t]o that end, Congress rejected statutory language encompassing 'comparable work.'" *Port Auth. of N.Y. & N.J.*, 768 F.3d at 254. Thus, while a plaintiff does not need to prove

34

that their work is "identical" to that of a higher-paid, opposite-sex comparator, "the standard is nonetheless demanding, requiring evidence that the jobs compared are 'substantially equal.'" *Id.* at 254 (first citing 29 U.S.C. § 206(d)(1); and then citing *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir. 1973)).

Here, Harris states that he "consistently performed duties requiring skill, effort, and responsibility equal to or greater than those performed by a female colleague (B. Glover-Cox), who held a comparable civil service title and was assigned to similar investigative, technical, and supervisory responsibilities," but that Harris "received materially lower compensation and was systematically denied advancement, merit-based pay increases, and promotional gain." (Am. Compl., Dkt. 27, at ECF 17.) He also names two other "female comparators" (M. Smith and D. Washington) whom he alleges "[h]ad equal or less seniority; [p]erformed the same core duties; [w]orked in the same office under the same supervisory structure; [and] [w]ere promoted to higher-paying civil service titles . . . while Plaintiff was passed over." (Opp'n, Dkt. 34, at ECF 26.) Harris does not state when those promotions occurred. (*See generally id.*; Am. Compl., Dkt. 27.)

Harris's allegations are lacking in the necessary factual specificity to make them viable. Harris does not state how much he or the alleged comparators were paid, nor does he sufficiently describe his job duties and those of the alleged female counterparts. (*See* Am. Compl., Dkt. 27, at ECF 17–18.) Rather, he states in conclusory fashion that the female comparators were assigned "similar investigative, technical, and supervisory responsibilities." (*Id.*; *see also* Opp'n, Dkt. 34, at ECF 26–28.) The most detail he provides is that he and B. Glover-Cox both "performed key functions including criminal investigations, report writing, and oversight of departmental statistical reports," but he does not specify what *other* job functions he and B. Glover-Cox each performed, only that their responsibilities were "similar." (Am. Compl., Dkt. 27, at ECF 17.) This

35

does not provide enough detail to support an inference of "substantial" equivalence. *See Port Auth. of N.Y. & N.J.*, 768 F.3d at 255–56 (explaining that even at the pleadings stage, plaintiff must allege "'sufficient factual matter, accepted as true[,]' to permit 'the reasonable inference that the relevant employees' job *content* was substantially equal'"; "broad generalizations drawn from job titles, classifications, or divisions, and conclusory assertions of sex discrimination, cannot suffice" (citing *Iqbal*, 556 U.S. at 678)).

The Second Circuit has found similar allegations to be insufficient to state an EPA claim. *See, e.g.*, *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 581 (2d Cir. 2020) (summary order) (holding that complaint failed to plausibly allege EPA violation when it alleged on information and belief that plaintiff was paid or offered less than similarly situated male employees but failed to allege specific job duties of plaintiff and putative comparators); *Kairam v. W. Side GI, LLC*, 793 F. App'x 23, 26 (2d Cir. 2019) (summary order) (holding that complaint failed to plausibly allege EPA violation when it described plaintiff's job duties, including, among other things, that she "analyze[d] patterns to see whether particular doctors were experiencing problems with particular insurers" and "analyze[d] denials to improve billing procedures," but only alleged that the comparator was paid to "run [a certain practice]" and that his job "involved administrative duties"). Although the Court recognizes that Harris's claims should be liberally construed and that similarly borderline EPA claims have in some cases been permitted to proceed, *see, e.g.*, *Chepak v. Metro. Hosp.*, 555 F. App'x 74, 76 (2d Cir. 2014) (summary order) (holding that plaintiff's allegations that she was "given a different title, but required to do the same job for less pay, as her male predecessors" were sufficient to survive a motion to dismiss on an EPA claim "[i]n light of [plaintiff's] *pro se* status"); *see also Barrett v. Forest Lab'ys, Inc.*, 39 F. Supp. 3d 407, 432–33 (holding that complaint plausibly alleged EPA violation by stating amount of plaintiffs' base

36

salary, identifying at least one opposite-sex comparator, alleging that the comparator received a higher base salary, and asserting that the comparators' "qualifications, experience, and responsibilities were no greater" than plaintiffs'), the Court finds otherwise and declines to allow Harris's EPA claim to proceed based on the Amended Complaint's largely conclusory allegations.

Therefore, Harris's EPA claim is dismissed.

### E.        Harris's Section 1983 Claims are Dismissed

Harris brings several claims pursuant to Section 1983 alleging violations of his constitutional rights, (Am. Compl., Dkt. 27, at ECF 18–21), all of which must be dismissed.

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *accord Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010).  To state a claim under Section 1983, a plaintiff must allege "that the defendant[] deprived [the plaintiff] of a right 'secured by the Constitution or laws of the United States'; and . . . that [the defendant] did so 'under color of state law.'" *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999)).  In order for a municipal agency like the DOHMH to be held liable under Section 1983, "it is not enough for the plaintiff to allege that one of the [agency's] employees or agents engaged in some wrongdoing.  The plaintiff must show that the [municipal agency] itself caused the violation of the plaintiff's rights." *Clifton v. New York*, No. 23-CV-10257 (LTS), 2024 WL 343088, at *3 (S.D.N.Y. Jan. 29, 2024) (citing *Connick v. Thompson*, 563 U.S. 51, 60 (2011)). Thus, a plaintiff must allege facts showing "(1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights." *Id.* (first citing *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); and then citing *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997)).

37

The DOHMH argues that "the Amended Complaint is devoid of *any facts* to suggest that the alleged actions were performed pursuant to [DOHMH] policy or custom." (Mem., Dkt. 35-5, at 21.)    Harris responds that the DOHMH followed a "consistent *pattern of denying accommodations*, ignoring supporting documentation, and retaliating against Plaintiff for seeking relief"; that the alleged actions "were carried out by supervisors and HR personnel acting pursuant to [DOHMH] established procedures"; and that "[t]he failure to train, supervise, or discipline those employees resulted in repeated civil rights violations." (Opp'n, Dkt. 34, at ECF 30.)  He further argues, without additional support, that the DOHMH "routinely denies accommodations to disabled employees while favoring others," that the "promotion process . . . disproportionately excludes Black men," and that the "remote work program was rolled out in a way that systematically excluded Plaintiff and others similarly situated." (*Id.*)

In line with the Court's conclusions above, the Court agrees with the DOHMH that "[n]o reasonable inference may be drawn that any of the conduct alleged in the Amended Complaint was discriminatory or retaliatory, let alone constituted a 'policy, custom, or practice' of discrimination." (Reply, Dkt. 36-3, at 11.)  The Court also agrees that Harris's "conclusory allegations" of established procedures, failure to train, and disparate impact on other unidentified employees beyond Harris himself "are insufficient to establish a policy or custom that was 'so persistent and widespread' that [it] was endorsed by [the DOHMH]." (*Id.* at 11–12.)

Harris's claims under Section 1983 are therefore dismissed.

### F.    Harris's NYSHRL and NYCHRL Claims are Dismissed in Part

As discussed earlier, although the Amended Complaint only pleads NYCHRL claims for disability discrimination and failure to accommodate, (*see* Am. Compl., Dkt. 27, at ECF 13), Harris's opposition papers suggest that he also intends to bring those claims under the NYSHRL,

as well as race, sex, and age discrimination claims under both statutes, (*see generally* Opp'n, Dkt. 34).  The Court liberally construes the Amended Complaint to include those claims.

As an initial matter, given that the NYSHRL and NYCHRL are more generous than their federal law counterparts, and the Court has found that Harris sufficiently alleges a failure-to-accommodate claim under the ADA, Harris has also done so under the NYSHRL and NYCHRL. *Dixon v. City of New York*, No. 23-CV-8941 (JGK), 2025 WL 50140, at *12 (S.D.N.Y. Jan. 7, 2025) ("[A] plaintiff who states a failure-to-accommodate claim under the ADA . . . necessarily states a failure-to-accommodate claim under the NYSHRL and NYCHRL." (citations omitted)). Those claims will survive.  N.Y. Exec. Law § 296(3); N.Y.C. Admin. Code § 8-107(28). Additionally, unlike federal law or the NYSHRL, the NYCHRL also provides an independent cause of action for failure to engage in an "interactive process" or "cooperative dialogue." *McSweeney*, 776 F. Supp. 3d at 249–50; *accord* N.Y.C. Admin. Code § 8-107(1)(a).  Since the Court has concluded that Harris sufficiently alleged a failure to engage in the interactive process, he has stated a claim for failure to engage in a cooperative dialogue under the NYCHRL.

However, Harris's NYSHRL and NYCHRL retaliation and discrimination claims— whether based on disability, race, age, gender, caregiver status, or family responsibilities—are dismissed for the same reason as under federal law: failure to sufficiently allege retaliatory or discriminatory intent.  That is true even given the more liberal pleading standards of the state and municipal statutes.  The NYSHRL and NYCHRL "still require[] a showing of *some* evidence" from which discriminatory or retaliatory intent can be inferred.  *See Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 20 (2d Cir. 2013) (summary order); *Lee*, 751 F. Supp. 3d at 284.  Here, there is none.  *See supra* at 29–33.

39

Therefore, Harris's NYSHRL and NYCHRL discrimination and retaliation claims are dismissed, but his failure-to-accommodate claims under both statutes and his cooperative dialogue claim under the NYCHRL shall proceed.

## CONCLUSION

The Court grants Harris's motion for leave to file a sur-reply, (Dkt. 39). For the reasons stated above, the DOHMH's motion to dismiss, (Dkt. 35), is granted in part and denied in part. Harris's Title VII, ADEA, FMLA, EPA, and Section 1983 claims are dismissed. Harris's ADA disability discrimination, retaliation, and hostile work environment claims are also dismissed. However, Harris's failure-to-accommodate claims under the ADA, NYSHRL, and NYCHRL and his cooperative dialogue claim under the NYCHRL shall proceed to discovery.

SO ORDERED.


/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: March 13, 2026
        Brooklyn, New York

40